May it please the Court, the trial court committed three errors. First, the court erred in rejecting a prior material breach argument. Second, the reduced capital ratios in First Federalist Financing Agreement applied solely to First Federal and not to future insolvent merger partners like Monroe. And third, the lost profits awarded were not reasonably foreseeable. With respect to prior material breach, while the court correctly found that a modified conversion was consistent with the financing agreement, it incorrectly held that Section 6.04 did not encompass the Canada Trust Overture that took place in 1988 and 1981. Under the plain language of the agreement, the Canada Trust Overture had to contemplate a common stock offering because Canada Trust wanted a majority stock position in First Federal. In the agreement, in 6.4, it says that the board of directors recently determined it's in the best interest to recite the conversion. So we all agree that they have the right to unilaterally determine it's not in the best interest and that that's what they did. Below, we do not take that position. However, we are not appealing that part of the trial court's decision. What we are appealing is the trial court's decision that under the next clause of Section 6.04, which is to require First Federal to report progress toward making a common stock offering, that First Federal failed to do that when Canada Trust made its overture in 1988 and 1989. But that assumes that these importunities or inquiries that the board of directors turned down somehow was progress. That's exactly right, Your Honor. Not that the progress seemed to suggest to people things that were First Federal-initiated, not that somebody outside said, hey, I'd like to sell you Christmas trees. The definition of common stock offering under the agreement was not limited to offerings that were initiated by First Federal. Common stock offering encompassed both standard conversions and modified conversions. But Judge Friedman was asking about the word progress, I think, not about common stock offerings. What does progress consist of? If somebody calls me and says, I'm interested, do you want to meet? And I say no, is that progress? That may not be progress, but that's not what happened here. Over the course of 1988 and into 1989, there were several conversations back and forth between Mr. Borschoff, the president of First Federal, and the representative from Canada Trust. In fact, in February of 1989, Mr. Borschoff went to the Strategic Planning Committee and said, Canada Trust has called again. What should I do? And the unanimous view of that committee was that First Federal should pursue discussions with Canada Trust and learn more specifics about the proposal. But the board decided not to go forward with any of these overtures. That's hard to characterize that as progress. The whole point of this notice provision was for the government to have notice of what First Federal was doing towards… What First Federal was doing, not what someone else was doing. First Federal was having conversations with Canada Trust. First Federal thought it was important enough to have the Strategic Planning Committee look at it, and they… I noticed there was an article in some banking journal that suggested the thing the First Federal could do to say it's helped out of its problems was to see if one of the wider companies wouldn't maybe buy it. Was that something they had to report as progress? No, because First Federal would have had no involvement whatsoever in that sort of suggestion. It was merely following that they got a phone call from Canada Trust, which was as follows. Did you see this morning's financial column? Yes, we did. Would you be interested, perhaps, in selling it? And they said, well, we'll think about it, but probably not. Would they have to report back? That could be… the word progress is broad. That could be encompassed… like I said, what happened here was much more advanced than that. And I will also note that in the reports that were made, for instance, in 1988… You have to show us that what they did was a breach of the contract. That's right. Material. Right. And it would seem to me that before they did a breach of the contract, there had to be rather specific indications as to what was going on. General language that they're supposed to report progress. First Federal… What is progress is always going to be disputed. I say we've made substantial progress, and you say we've made no progress. That happens all the time in relations. Well, let's look at what First Federal viewed its obligation under 6.04 to be in 1988, right around the same time. At that time, it had strategic plan type meetings where it merely talked about alternatives to a standard conversion, like a modified conversion or mutual holding company type acquisition. Those were reported, yet the cabinet trust proposal was not reported. The government had an interest here. What happened was, when the recapitalization proposal was entered into in 1986, the government forgave $158 million of debt by First Federal. The government put $200 million of assistance into the deal. And First Federal's obligation was to raise $150 million in capital as soon as practicable. If they had reported this, as you say they should have, what would the government have done differently than what it actually did? If it had been reported, the government would have had an opportunity to weigh in on the proposal and perhaps persuade… You don't say the government would have done anything specific to change the outcome of what happened. You just say they would have had the opportunity to talk to these people and persuade them they should accept it? Yes, two responses to that. That was a very important right of the government under this agreement. The government's interest was in having, number one, First Federal raise capital as quickly as possible and get its capital levels up to where they were supposed to be under the statute. Number two, the government had warrants to buy 25% of whatever stock was going to be issued in connection with this offering. And it was looking to recoup some of the $200 million investment it had made. Also, under this court's decision in Thomas v. Hud, our responsibility is not to show that things would have been different. In that case, the government argued things wouldn't have been different if this breach happened and this court found nonetheless that it was a material breach of contract. Here, the essence of the contract was First Federal's obligation to raise capital. The government had already done its part. If First Federal had had this opportunity and not disclosed it and we had found out about it at the time, it would have been within our rights to cease performance under the contract. That's a classic example of prior material breach. So therefore, there's no question that there was a prior material breach. And this court reversed the trial court's holding otherwise. With respect to the Monroe Acquisition, the plain language of the agreement governing the capital ratios that First Federal was subject to said that the reduced capital ratios applied to First Federal. Those reduced capital ratios did not apply to other grant. It only goes to First Federal's capital compliance. What First Federal is suggesting here is that it could go out and acquire several $5 or $6 billion capital deficient insolvent thrifts and that those thrifts could do an end run around capital regulations and say, hey, we've got deficient capital, but all we have to do is merge with First Federal. I think that's what their argument is. I may be wrong, but I understand their argument. They say that Section 610 said, in effect, that in considering anything happened to First Federal, they would rely on the capital ratios set forth in that section and therefore, when they said, no, we're going to turn Monroe down because we don't meet the higher standards under the new statute, that was inconsistent with what was set forth in the contract. That's what I understand their argument. I'm not saying you can go out anywhere and buy as many as you want. And that's the issue, isn't it, whether somehow the regulators committed themselves in Section 610 that when they came to consider any applications for acquisitions, they would be guided by the standard in 610 and not by some other standard. That's the issue, isn't it? That's the issue, and First Federal's interpretation is wrong. Section 6.10 was intended solely to protect First Federal from falling out of capital compliance because it did not, when the recapitalization took place in 1986, it was not at the statutory levels that were required at that time. How are we supposed to know that? The first sentence in 610 says that the amount of network required for a bonder, the regulatory section, or any successor regulation shall not be required of First Federal. How are we supposed to know? The key is that it shall not be required of First Federal. What was happening with respect to the Monroe acquisition is that you were bringing in a thrift that wasn't even regulated by the Federal Home Loan Bank Board. It was an FDIC institution. It was capital deficient. It was essentially insolvent. So you're saying that that first sentence is completely not applicable to any mergers or acquisitions? Unless the merger partner met the statutory requirement. Where are we supposed to believe that? Because it states only that it applies to First Federal. First Federal's interpretation of the contract says this 1.09 reduced capital ratio set forth in section 6.10 applies not only to us, but to anybody else out there who merges with us. That's not safe. The consequences are obvious, but they're not saying that. All they're saying is that the contract provision is limited to looking at capital ratios and does not apply to a decision whether to authorize a merger. And that's where they're wrong. If you look at section 6.09, it said that all other regulatory standards apply. Now the regulation that governed mergers did have a reference to section 5.613 of the regulations, but it was talking about a merged association, not just First Federal itself. They're talking about an insolvent thrift that was going to be merging into First Federal. The whole point of these reduced ratios is to get First Federal in. The question is whether to merge. The agreement isn't in the agreement that relates to mergers. The agreement does not preclude mergers. I asked you that question. Is there anything in the agreement that sets the standard for mergers? No. But that's really not relevant to this question, because the question is whether section 6.10 would allow It might be relevant. I don't know. Well, you're right. The government's position is that it's not relevant, because section 6.10 cannot be read to allow any thrift other than First Federal to have these reduced capital ratios. And in fact, the purpose of 6.10 was to prevent First Federal from having to enter into a supervisory agreement at the time of the recapitalization in 1986. At that time, notwithstanding the government's forgiveness of the debt and notwithstanding the government's $200 million in assistance, First Federal was so bad off that it still wasn't going to make the minimum statutory requirements. And that's why section 6.10 is in there. And that's page 200, 208 of the record. Section 6.10, in combination with the capital plan that was attached at the back of the agreement, were to prevent First Federal from being, the government taking action against First Federal for its failure to comply with the requirement, which is about 3% that was in effect at that time. It was to protect First Federal and let it keep moving forward. It wasn't to allow it to engage in collateral activities with unsafe and unsound other thrifts. But how are we to glean that from anything in this agreement? I don't see anything in 6.10 that makes the argument that you just made. Well, in section 6.09, it states that during the term of this agreement, First Federal will comply with any and all other applicable statutes, regulations, orders, etc. of the Federal Home Loan Bank Board. Does that mean anything more than before attempting a merger that will get the approval of the regulatory bodies? No, it means they're subject to all restrictions of all other regulations administered by the Federal Home Loan Bank Board. What do you mean all other? Where's the other? What are the other? It's page 274 of 6.09. I don't think it's 6.09. During the term of this agreement, First Federal will comply with any and all applicable statutes, regulations, or orders for any restriction imposed by the United States. And if you skip down, it says except as set forth in section 6.10. Right. So, First Federal could not use 6.10 to avoid all other regulatory restrictions that the government could apply. Here, the government looked at this merger and decided that because Monroe was capital deficient, that it would not be a safe and sound activity for First Federal to merge with it. And First Federal was effectively viewed as having a forbearance. And even the regulations in effect in 1988 said that if you have a forbearance, you have to look very closely at the policy issues with trying to transfer that forbearance to another threat. That was a concern of both the Federal Home Loan Bank Board and the FDIC, which was the… I suppose you could argue that there's nothing in this. You know, I've noticed my time is… Yes, that's right. As you say, I suppose you could argue that there's nothing in this agreement that in any way purports to limit the regulator's authority to apply traditional standards in approving or disapproving a merger. That's correct. The only thing that 6.10 did was say that regulators could not take action against, like a cease and desist order or a capital plan or any other action that it could normally take for a threat that was capital deficient. Well, with our assistance, you exhausted your rebuttal time. But we'll restore three minutes of rebuttal. Thank you, Your Honor. And let's have three minutes for First Federalist. Morning, Your Honor. May it please the Court that David Case and the law firm of K&L Gates, on behalf of the First Federalist, are here. Contracts are the lifeblood of commercial enterprise. In this case, it's really about the terms of a contract, the physical financing agreement, and the foreseeable consequences of the breach of that agreement. The first issue Apollo raised was that the First Federal did not report the 1988 Canada Trust signature to regulatory authorities and has termed this a prior material condition. We don't think, A, it's a breach. We certainly don't think it's a material. We believe the trial court's judgment on this is fully supportive of the record. And one of your arguments, if I understand it correctly, is that 6.4 is limited to standard conversion. Your Honor, we believe that the language of 6.4 is properly understood. It can encompass a standard conversion. At the end, to take that further, and the Canada, even if there were discussions or whatever, that didn't implicate a standard conversion. That's correct, Your Honor. The Canada Trust conversion had to proceed as a modified conversion, not a standard conversion. A standard conversion would consist of an offering to depositors first, then an offering to the public. We believe that kind of conversion is what's implicated in the language and often would come in stock. And as we ask the government to determine, what is it in 6.4? Where is the language in 6.4 that we need to determine if it's standard conversion? Your Honor, I think the language that we point to there is the concept of common stock offering. A stock offering is an offering initiated by a trust federal. It's an offering that's a voluntary offering, and we believe it implicates to the public and to depositors, not what would happen in the context of a Canada Trust acquisition, where, yes, it would have to convert from mutual form to common stock form, and then Canada Trust would take over 99% of the stock. But you're just reading the language in the narrow sense. Is there anything to suggest that that's a proper reading of that agreement? Yes, Your Honor. I think if the court wants to look beyond the agreement, the court can look to other tools. The Canal Memo, which was written, and that's how it was referred to commonly in July of 1986, right before the first federal financing agreement, which set the grounds for it and justified it to the regulatory authorities, said the first federalist goal was to undergo a standard conversion. And if you look at the capital plan, which is attached to the agreement, and which the government makes much about when it goes to foreseeability, that capital plan references things like access to the public markets, public offerings. Now, that language is a matter of logic that would apply to a standard conversion, and it isn't just a matter of language and logic. The court looks at the testimony of Mr. Warshaw. In the security field, I think the private offering is a public offering, right? The private offering is still an offering of security. Correct, Your Honor. And you say that under this agreement, the reference to offering was to a public offering? Yes, Your Honor, and the way we would get to that logic, Your Honor, is to look at the attachment of the capital plan, which refers specifically to the intent to access the public markets, Your Honor, and the public offering. So in the dichotomy the court posed there, we believe that the capital plan indicates quite clearly that it's contemplated under 604. And by this agreement, it's a public offering, which in this context is a standard conversion. Had the Canada Trust overturned its decision about the board, would there have been an obligation to disclose that? Yes, I think, Your Honor, if the board had gone forward and looked at the Canada Trust and decided, in fact, yes, we're going to allow ourselves to be taken over, there would definitely have to be disclosure of the regulatory authorities in that context, both under 604 and otherwise. So you would define progress as requiring as a threshold matter some impriminata by the board of directors? Yes, Your Honor. Because so much discretion, in fact, all discretion is rested in the board of directors, I say the board shall have reasonably determined that it's in the best interest of this federal proceeding with the conversion. In that context, the testimony is Mr. Borschoff, the president, told Canada Trust we're not interested, but nevertheless, he went to the board and got confirmation that his reaction was the right one. And so the board, for reasons which were set forth in the judge's opinion, had decided not to go forward and not to pursue in any significant way Canada Trust until after the breach. The government is correct, and I think it is, that it has some stakes, some financial interest of 25% or whatever at the end game. Why wouldn't they want it in 604 to assure themselves they can become aware of this so they could go lobby the board of directors? I mean, if they have an ultimate interest in the way this comes out and the way Canada Trust came up, why shouldn't they have had the ability to go and make their position known, and why isn't that entirely consistent with what presumably is the intent of 604? Well, Your Honor, that was their interest and their intent, to find out about every kind of overture that came in. And Mr. Vigna testified, and the government makes much of it, and says, I think they had an obligation to notify us of any overture that bar capital into the institution. It doesn't say that, Your Honor. That's not what 604 says. They could have crafted 604 in such a way to say that it was act-timed. They didn't. And, in fact, in this instance, they crafted 604 to wrest sole discretion of the board of directors, like in any company. But there is that peculiarity. We don't know whether progress means a baby step or whether it's you're suggesting that progress only comes into play once the board of directors has approved something. They've met, they've approved it, and then what happens after that is progress towards it. Why should we necessarily accept that? I wouldn't go so far as to say progress is only if the board accepts, Your Honor. I would confess and say here that if the board considered it and said we are going to enter into negotiations with Canada Trust as to how they might acquire us, yes, then there should have been some indication to the regulator. But that's not what happened here, Your Honor. What happened in this instance was an overture in the context that the board considered and the board had the sole discretion, the board didn't want to move forward. There's no evidence, Your Honor, in this record that any testimony from any regulator that the board made an imprudent decision, that the board made an unreasonable decision, and there's no evidence That's not the issue before us. The issue is you entered into an agreement obligating yourself to apprise the government of something at some time. The government doesn't have to prove everything that you're suggesting. Right, Your Honor. But in this context, the government can't show that there's any materiality to this breach at all because there was an overture. It was properly considered. There was nothing to be done in response to the overture. Did one ever meet with representatives of Canada, a Canadian company? Your Honor, what happened was... Don't tell me what happened. Just answer my question. I will, Your Honor. Did the board ever meet with those people? Your Honor, the board ultimately authorizes the board, Shaw, to go meet people there and keep the options open. I understand. And then after... The board did not meet with these people. Not all the board together, Your Honor. What happened was... There was no board meeting in which someone representing this country came in and said, let me tell you what we proposed. After the breach, Your Honor, after Florida was enacted, after... That breach was ultimately led to the final decision. Yes. But at the time, with respect to these overtures that the government said you were required to avoid, there was no meeting between the board that had final authority over these things and representatives of the proposed possible loss of war. There was no meeting before the board, Your Honor. That would be correct. Yes. Let me jump into the second issue. Yes, Your Honor. You've got to reconcile 6-9 and 6-10. So why can't you clearly read 6-10 as only applying to federal... First, federal's obligation to maintain the capital ratio, and then say 6-9 applies to mergers and acquisitions. What's wrong with that reading? Your Honor, I think what 6-10 applies to is when there's a merger, a potential merger, and the resulting institution is first federal, as is going to happen in the Monroe case, the capital standards by which that resulting institution would be assessed... Well, I'm not surprised if that's your position. The question is what language are you pointing to that supports that? You start off by saying when 6-10 applies, when there's a merger. How do you know that? Your Honor, we say our view is the language, the amount of net worth required for any successor regulation shall not be required of first federal. And then it later goes on first federal to include successor institutions. There's nothing on that that in any way limits the regulatory authority's ability to impose as a result of a commission to approve a merger that they meet descriptive standards of the statute of limitations. There's nothing explicitly saying that. You said it should be read into that. I think, Your Honor, that this language is binding on the government. In 1986, what the government agreed to in 6-10 was that for capital requirements for first federal, which would include first federal as a successor, which was in the contract, the net worth required under 2012 CFR shall not be required. Instead, it says, first federal will be required to have a net worth liability ratio, and then it sets forth those specific ratios. But I would suggest to you, if it was intended that that limitation should also apply to any merger applications, they could easily have said so, including any application to merge or acquire. No, they didn't. When you read it, it sounds as though what they were looking at was only the capital requirements of first federal. Your Honor, I would respond to that in two ways. One is, I believe that first federal means the savings and loan association and any successors, so it would apply once the merger is done. It applied, but the question is what applied? The capital standards of 6-10. And the other evidence of that that's replete in the record is that's the way the Federal Home Loan Bank of New York analyzed the Monroe transaction prior to Korea. There were three occasions at least when the Federal Home Loan Bank analyzed it, and the first one was in November of 88. They looked at the merged institution, Monroe and first federal, and applied that merged institution against the capital standards of 6-10. And they looked and they said, well, it's going to decrease it slightly, but it's still well above 6-10. That should be fine. The second time they looked at it was in February of 89. They did the same thing, Your Honor. The Federal Home Loan Bank of New York in a memo looked at the merged institution to see if it met 6-10, and then in the digest, which is a much more formal document, they specifically indicated there was no limitations on merger in the financing agreement, there was no supervisory objection, and all the regulatory standards were approved. So when the regulators prior to Korea looked at the merger, Your Honor, they looked at it in the context of does the institution that lines up first federal here meet 6-10, not other capital standards. I believe that would be, if I were trying to answer your question that way, the best evidence of how 6-10 should be interpreted is how the Federal Home Loan Bank Board of New York looked at this time and time again. But that was not the agency that had authority to approve this merger, was it? Your Honor, ultimately they did not have the authority to approve it, Your Honor, but they were the ones who monitored this, it was the application of the financing agreement, they were the ones on the ground who worked with it most definitely, and our view is exactly what the court said. The problem is that when the bank board, or at that time OTS, came to look at the regulatory and look at the capital standards applied to the merged institution, they did not look under 6-10. In fact, they looked under Korea. And that is the breach we're looking at. Your Honor, I'm running short of time. If the court has more questions, I'm happy to answer. I'll just briefly address the issue of foreseeability here. Does the court have any additional questions on the merger or any of the cost of the merger? On foreseeability, Your Honor, once again we would point out that this is a question of fact. Everybody agrees on that. And there was clearly growth, significant growth, foreseen in 1986, while still a phoenix of limited growth. The court looks at the budget, A300093, and it's $348 million. Your Honor, we believe that, yes, there is some limitation on magnitude. What does magnitude mean? That's, I guess, one of the no's here. Well, we've demonstrated today we don't know what any of those are. Our cases do, there is cases, right? Right. Your Honor, we believe that in this context, if you look at the magnitude of damages and what was foreseeable, we believe that it is foreseeable in the magnitude. And you're looking at four times the projection in terms of your position is what was foreseeable is four times the projection, four times the projection. Yes, Your Honor, and I guess I would, as an advocate, quarrel with the assumption in the court's question, which is that these projections indicated any sort of limit or any sort of expectation on the part of the government. Well, they may not have been a limit, but they certainly reflect the foreseeability in terms of growth. Your Honor, there is no testimony in the record of any government regulator that these reflected the expectations of the government. In fact, I think what properly reflects the expectations of the government on growth is the growth that you could accomplish under the capital ratios of 6-10. What did those projections reflect? Your Honor, they reflected, according to the testimony of Mr. Chaffran, they were intended as conservative assumptions to demonstrate that once this was done, the post-federal would be a viable institution even if it failed to reach its objectives. I mean, its objective, 348 million in growth as of Phoenix in 1986, which is roughly 8% of its capital base. Do you agree, I say, that the foreseeability includes not only the fact of damages, but also the amount? Not the precise amount, Your Honor, but some sense of a magnitude here. And I think what was... If you estimate the amount of profit was not 3 or 4 times, but 100 times, you would agree that wouldn't have been foreseeable. Exactly, Your Honor, and the reason it wouldn't be... But how does one draw the line? At what point, if it increases 20%, 50%, 100%? Is that for the trier of fact to determine on the basis of all the evidence? I think it's an issue for the trier of fact to determine, and I also think here we have the outward bound of what is foreseeable encompassed in the capital ratios of 6-10. They could only grow to the extent they did not put in jeopardy the capital ratios of 6-10. And the evidence of that, Your Honor, that's in the record, that's very clear, is in July of 1989, the First Federal made one of these semi-annual reports that we looked at, and it says, as such, the capital level could support an association  In contrast, the association has undertaken a strategy of modest growth in a range of 10-12% since 1986, and its bank business activities in support of this modest growth. Mr. Vigna, the regulator, testified at A100450 that he agreed they could have been growing much more right up to their capital ratio, but that they were doing it conservatively. Mr. Pallant, who testified about those numbers in the financing agreement, said there weren't limits, all the growth had to be done in a true fashion. I have a question. If the government were to prevail in its foreseeability arguments, would that wipe out all the damages of disproportionate? Well, certainly, Your Honor, it doesn't address the damages that relate to mortality. It doesn't relate to the damages that were connected with the capital trust transaction, restructuring assets, fees. And, with regard to lost profits, it doesn't eliminate all of those, because our calculus, the way we looked at it, you would have to start, okay, in 1990, we forewent the growth there. So, if we were to hold that the profits were enough for us to be able to reduce the damages, we're not eliminating them. That would be correct, Your Honor. On that note, your time has expired. Thank you very much. Thank you, Your Honor. First, with respect to Monroe, the government reserved all rights, not specifically given up in Section 6.10. The government jealously reserves its rights to regulate the safety and soundness of thrift institutions. And, given the possible enormous impact that plaintiff's interpretation of Section 6.10 could have in a merger context, there's absolutely no way that the language of the agreement can justify Judge Miller's finding that an insolvent merger partner could merge with First Federal and take advantage of a capital ratio that was only one-third that was required under the regulations. Further, Mr. Gates mentioned several times that, well, the agreement applied to successors, so, therefore, it had to apply to First Federal and its merger partner. Well, that reference to successors would be to a successor like Canada Trust. Now, it may be arguable that if Canada Trust had actually purchased First Federal in 1989, that it wouldn't be able to enjoy Section 6.09, but we're not talking about a merger application that had to be reviewed for safety and soundness and with an insolvent agreement. With respect to the prior material breach argument, first, with respect to Mr. Plaintiff's counsel's argument that 6.04 only applied to standard conversions, the plain language of the agreement applies to any conversion, and it also applies to all common stock offerings. And what Mr. Gates did not mention is that the definition of offering document in the agreement itself applied to both public offerings and private placements. So what Judge Freeman said earlier is absolutely applicable here. Also, First Federal itself, in 1991, when it finally did the modified conversion with Canada Trust, reported it under Section 6.04. Its semiannual report made at that time said we're probably modifying this report in accordance with 6.04. It was, but the Your Honor, I would say that there were negotiations here because the Strategic Planning Committee authorized Mr. Borschoff to pursue the proposal and to get more information. Also, by saying that there had to be an actual approval of a deal to go forward, write the notice provision out of the agreement. That would mean, once you have a completed common offering proposal, come give us notice then. And that's not what it says. It says progress toward a common stock offering. And finally, with respect to foreseeability, the capital ratios in 6.10 do not govern foreseeability. The agreement in 6.11 said that the capital plan which had First Federal reaching the statutory minimums was what First Federal was to be governed by, not 6.10 and its growth. It couldn't engage in rampant growth without violating another provision of the agreement. 6.11 said we will make every effort to comply with our capital plan. The capital plan had the statutory minimums which it was supposed to reach by raising capital. And it also said even if market conditions are not ideal for a conversion, we will take every step to reach the statutory minimums as soon as possible. So you can't read the agreement as allowing them to, in effect, lever down through growth to the 6.10 minimums when those minimums were only to protect them from adverse action by the government. And also the July 1989 report, which claims counsel made reference to, that July 1989 report is a post-recapitalization document. What we're looking at is the government's expectations at the time that the recapitalization agreement was entered into in 1986. At that time, no one was projecting 13% growth by First Federal in 1989. The projections were around 2-3% and had never grown by more than 4-5%. So there was absolutely no way that the government could reasonably have foreseen the magnitude of the growth that Governor Miller assumed from the awarded lost profits based upon the 13%. Okay, thank you very much. If that clarification is submitted.